UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHLAME KRAUSZ,

                              Plaintiff,

        v.

EQUIFAX INFORMATION
SERVICES, LLC, *and*
U.S. BANK, N.A.,

                              Defendants.

No. 21-CV-7427 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Kenneth Willard, Esq.
Mark Rozenberg, Esq.
Stein Saks, PLLC
Hackensack, NJ
*Counsel for Plaintiff*

Marc Cabrera, Esq.
Morgan Fiander, Esq.
Polsinelli PC
New York, NY
*Counsel for Defendant U.S. Bank, N.A.*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Shlame Krausz ("Plaintiff") brings this Action against U.S. Bank N.A.

("Defendant" or "U.S. Bank"), alleging that Defendant engaged in unlawful credit reporting

practices in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, et seq.

(*See* Am. Compl. (Dkt. No. 25).)[1]  Before the Court is Defendant's Motion for Judgment on the

---

[1] On September 30, 2021, Plaintiff filed a notice of settlement with Equifax Information
Services, LLC ("Equifax"), (see Dkt. No. 12.), followed by a notice of voluntary dismissal of
Plaintiff's claims against Equifax on January 6, 2022.  (See Dkt. No. 19.)

Pleadings, pursuant to Federal Rule of Civil Procedure 12(c), 12(b)(1), and 12(b)(6) (the

"Motion").  (*See* Not. of Mot. (Dkt. No. 34).)  For the reasons explained herein, the Motion is

granted.

I.  Background

A.  Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider either Plaintiff's

Equifax credit report, (*see* Decl. of Morgan C. Fiander Ex. A ("Credit Report") (Dkt. No. 35-1);

Pl.'s Mem. of Law in Opp'n to Mot. Ex. A (Dkt. No. 39-1)), or the investigation report furnished

by Equifax regarding Plaintiff's credit report, (*see* Decl. of Morgan C. Fiander Ex. B

("Investigation Report") (Dkt. No. 35-2)), at this stage of the litigation.

1.  Applicable Law

Generally, "[w]hen considering a motion to dismiss, the [c]ourt's review is confined to

the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would

convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule]

56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y.

2002) (citation omitted).  However, "the [c]ourt's consideration of documents attached to, or

incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken,

would not convert the motion to dismiss into one for summary judgment."  *Id*. (citations

omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling

on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . .,

documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir.

2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the

pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and

2

matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))). *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021) ("[C]ourts may on a Rule 12(c) motion—just as on a Rule 12(b)(6) motion—consider extrinsic material that the complaint incorporates by reference, that is integral to the complaint, or of which courts can take judicial notice." (alteration, quotation marks, and citation omitted)).

"Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'" *Alvarez v. County of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). As the Second Circuit has reiterated, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted).

The final test for the consideration of extrinsic evidence is the Parties' view on the authenticity thereof. Put simply, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" for it to be considered at the motion to dismiss stage. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Relatedly, "[u]nder Federal Rule of Evidence 201, a 'court may judicially notice a fact that is not subject to reasonable dispute.'" *Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021) (quoting Fed. R. Evid. 201(b)). "Such facts must either be (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by

resort to sources whose accuracy cannot reasonably be questioned." *Id.* (citation and quotation marks omitted).

### 2.  Application

#### a.  Equifax Credit Report

Defendant argues that the Court may consider the credit report because "it is the very document which contains the information alleged in the [Amended Complaint] to be the basis for claims and damages against U.S. Bank, and is relevant and integral to the [Amended Complaint]."  (Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") 8 (Dkt. No. 36).)  Plaintiff appears to agree, attaching an identical copy of the credit report to Plaintiff's Memorandum of Law in Opposition.  (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") 2 n.1 (Dkt. No. 39) ("The Court may consider these credit reports without controverting Defendant['s] motion for judgment on the pleadings to a motion for summary judgment."); *see also* Pl.'s Mem. Ex. A.).)  Moreover, given that the Amended Complaint as well as the Parties' briefing papers quote extensively from the credit report, the Court considers the credit report incorporated by reference and/or integral to the Complaint and therefore properly within the Court's consideration at this stage.  *See Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 910 n.3 (2d Cir. 1988) (holding that the magistrate judge was authorized to treat a letter as incorporated by reference into complaint when, inter alia, the plaintiffs "quote[d] the entire text of the [l]etter" in a memorandum of law); *Pincover v. J.P. Morgan Chase Bank, N.A.*, 592 F.Supp. 3d 212, 221 (S.D.N.Y. 2022) (considering a deposit agreement as integral to the complaint, which asserted claims for breach of contract that were premised on, inter alia, the deposit agreement's terms); *Cheng v. Canada Goose Holdings Inc.*, No. 19-CV-8204, 2021 WL 3077469, at *5 (S.D.N.Y. July 19, 2021) ("These conference call transcripts are clearly integral to [the] [p]laintiff's [a]mended [c]omplaint here, given that [the] [p]laintiff heavily relies on and quotes many

statements made by [certain defendants on the call] in the [a]mended [c]omplaint for both of

their claims.  [The] [p]laintiff also did not object to [the] [d]efendants citing these transcripts in

their memorandum of law supporting their motion to dismiss.").

<u>b.  Equifax Investigation Report</u>

The integral nature of the investigation report to the Complaint requires deeper

examination.  Defendant argues that the investigation report "provided Plaintiff's purported basis

to bring the claims against U.S. Bank as to an incomplete or unreasonable investigation."  (Def.'s

Mem. 9.)  Plaintiff argues that the Court should not rely "on a credit bureau's investigation report

because it is not at all clear that a creditor would have access to the information conveyed in that

report."  (Pl.'s Mem. 21.)

In the Amended Complaint, Plaintiff alleges that U.S. Bank "failed to conduct a

reasonable investigation and continued to report false and inaccurate adverse information on the

consumer report of the Plaintiff with respect to the disputed account.  (Am. Compl. ¶ 22.)

Moreover, Plaintiff alleges that "[h]ad U.S. Bank done a reasonable investigation of the

Plaintiff's dispute, it would have been revealed to U.S. Bank that the current account status was

improperly listed as past due."  (*Id*. ¶ 23.)  Plainly, Plaintiff would not have any information

about U.S. Bank's investigation without Equifax's report.  (*Id*. ¶ 20–21 (alleging that Plaintiff

notified Equifax of the disputed information on or around February 11, 2021, and Equifax

notified U.S. Bank of the dispute).)  Indeed, the investigation report outlines U.S. Bank's

investigation, stating that "[t]his creditor is currently reporting a zero balance for this account.

The following fields have been modified: *additional information *account history."

(Investigation Report 9.)

However, this Court agrees with Plaintiff that the investigation report should not be

considered in deciding the instant Motion.  (*See* Pl.'s Mem. 21.)  "[T]he investigation report[]

[is] not what a reasonable user or creditor would see when reviewing [Plaintiff's] credit report or account information.  Therefore, even considering the investigation reports as evidence of the account[] [while assessing the allegations] . . ., [information] provided in the investigation report is entirely irrelevant." *Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 299 (E.D. Pa. 2021) (citing *Bibbs v. Trans Union LLC*, 521 F. Supp. 3d 569, 574–75 (E.D. Pa. 2021)).  As such, the Court will not consider the investigation report for the purposes of Defendant's Motion.

    B.  Factual Background

       Unless otherwise stated, the following facts are drawn from the Complaint and are assumed to be true for purposes of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

       Plaintiff alleges that at some point prior to February 11, 2021, U.S. Bank reported certain inaccurate information to Equifax regarding Plaintiff's retail lease account with U.S. Bank.  (*See* Am. Compl. ¶¶ 8, 20, 21; Credit Report 4 (naming the account as "US Bank NA Retail Lease (Closed)").)[2]  Specifically, U.S. Bank provided "inaccurate" information about Plaintiff's account status, "continu[ing] to report the Plaintiff's account status as 'not more than three payments past due'" despite the fact that "Plaintiff's account was paid off and closed out with a zero balance."  (Am. Compl. ¶¶ 10–12.)  Plaintiff alleges that "[s]uch reporting is inaccurate on its face as it fails to properly advise as to the actual status of Plaintiff's debt."  (*Id.* ¶ 12.)

---

    [2] Plaintiff does not reference a particular credit reporting agency in his Amended Complaint, referring instead to "a credit reporting agency" throughout.  (*See e.g.*, Am. Compl. ¶ 8.)  However, both Plaintiff and Defendant name Equifax as the credit reporting agency throughout their briefing, which makes sense given that Equifax was previously in this litigation. As such, the Court will refer to the "credit reporting agency" as Equifax.

Relevant to the instant Action, the credit report also lists several other categories of information about the Plaintiff's account. The report provides several tables of "account history" identifying among other things the account's balance, scheduled payments, actual payments, and amount past due. (Credit Report 4–5.) Regarding the account history, Plaintiff alleges that U.S. Bank reports information that "explicitly contradicts the account status, preventing the account status from . . . being interpreted as merely a representation of the account's history." (Am. Compl. ¶ 13.) Specifically, Plaintiff alleges that "the payment history indicates that Plaintiff's account had a 60-day delinquency at the time of the final payment," which Plaintiff alleges "is in direct conflict with the account status," that states that the account is "not more than three payments past due." (*Id*. ¶ 14.) "As a result, reading the report as a whole, this contradictory information does not allow for a specific conclusion to be drawn regarding the extent of Plaintiff's delinquency." (*Id*. ¶ 15.)

The credit report also contains additional relevant information, including naming the "reported balance" as $0, (Credit Report 4); and providing a chart indicating the "payment history" of the account, (*Id*. at 5–6.) The payment history indicates that the account was 30 days past due in October and November 2018, as well as August and September of 2019, and that the account was 60 days past due in November and December of 2019. (*Id*. at 6.) Finally, the credit report lists several "account details," including noting the balance as "$0," and designating the "activity" of the account as "PAID_AND_CLOSED." (*Id*.) The report also identifies the "date of first delinquency" to be October 1, 2019, the date of last payment to be December 1, 2019, and the account closure date to be March 1, 2020. (*Id*.) Finally, the following relevant fields are left blank: "Amount Past Due," "Actual Payment Amount," and "Scheduled Payment Amount." (*Id*.)

On or about February 11, 2021, Plaintiff notified Equifax that he disputed the accuracy of the reporting of his account with U.S. Bank. (Am. Compl. ¶ 20.) Plaintiff alleges that Equifax thereafter notified U.S. Bank of Plaintiff's dispute. (*See id*. ¶ 22.) Plaintiff alleges that "U.S. Bank failed to conduct a reasonable investigation and continued to report false and inaccurate adverse information on the consumer report of . . . Plaintiff with respect to the disputed account." (*Id.* ¶ 22.) Finally, Plaintiff alleges that as a result of U.S. Bank's actions, Plaintiff has "suffered concrete harm in the form of loss of credit, loss of ability to purchase and benefit from credit, a chilling effect on applications for future credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denial." (*Id.* ¶ 25; *see also id.* ¶¶ 33, 45.)

C. Procedural History

Plaintiff filed his initial Complaint on September 3, 2021, bringing claims under the FCRA against U.S. Bank and Equifax. (*See* Compl. (Dkt. No. 1).) On September 30, 2021, Plaintiff filed a notice of settlement with Equifax, (*see* Dkt. No. 12.), followed by a notice of voluntary dismissal of Plaintiff's claims against Equifax on January 6, 2022. (*See* Dkt. No. 19.)

On February 10, 2022, Plaintiff filed a First Amended Complaint, bringing claims under the FCRA against only U.S. Bank. (*See* Am. Compl.) On February 24, 2022, U.S. Bank filed a pre-motion letter in anticipation of filing a motion for judgment on the pleadings, (*see* Dkt. No. 26), to which Plaintiff responded on March 7, 2022, (*see* Dkt. No. 28). The Court held a pre-motion conference on April 6, 2022, (*see* Dkt. (minute entry for April 6, 2022)), and set a briefing schedule, (*see id.*; *see also* Dkt. No. 33). Defendant filed the instant Motion on April 29, 2022. (*See* Not. of Mot.; Decl. of Morgan C. Fiander (Dkt. No. 35); Def.'s Mem.) Plaintiff filed his response on May 23, 2022. (*See* Pl.'s Mem.) Defendant filed its Reply on June 3, 2022, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. ("Def.'s Reply Mem.") (Dkt. No. 40)). After

seeking leave from the Court, (*see* Dkt. No. 42), Plaintiff filed a sur-reply on June 21, 2022, (*see* Pl.'s Sur-Reply in Supp. of Opp. to Mot. ("Pl.'s Sur-Reply") (Dkt. No. 43)).

## II.  Discussion

### A.  Standard of Review

The standard of review for granting a Rule 12(c) motion for judgment on the pleadings is identical to those for granting both a Rule 12(b)(6) motion for failure to state a claim and a Rule 12(b)(1) motion for lack of subject matter jurisdiction.  *See Lively*, 6 F.4th at 301 ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) ("In deciding a Rule 12(c) motion, we employ the same standard applicable to dismiss pursuant to Rule 12(b)(6)." (alterations and quotation marks omitted)); *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) ("The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'" (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation

marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *see also Lynch*, 952 F.3d at 74–75 (applying *Twombly* and *Iqbal* standards to Rule 12(c) motion).

When ruling on both a Rule 12(c) motion and a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 94 (citation omitted); *see also Cho*, 991 F.3d at 162 ("The standard of review for a Rule 12(c) motion is the same as for a Rule 12(b)(6) motion: we must 'accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor." (alteration omitted) (quoting *Bryan v. Credit Control, LLC*, 954 F.3d 576, 580 (2d Cir. 2020))).  Additionally, when ruling on both types of motions, district courts are directed to

confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin,* 6 F.4th at 473 (2d Cir. 2021) (quotation marks omitted); *see also Lively*, 6 F.4th at 305 ("[C]ourts may on a Rule 12(c) motion—just as on a Rule 12(b)(6) motion—consider extrinsic material that the complaint incorporates by reference, that is integral to the complaint, or of which courts can take judicial notice." (alteration and quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).  When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden," *id.* (citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)), and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue," *id.* (alterations omitted) (quoting *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir.2009)).  In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor.  *Id.* at 57.  However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings, a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial.  *See Katz v. Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017).  "If the extrinsic evidence presented by the defendant is material and controverted, the . . . [C]ourt must make findings of fact in aid of its decision as to standing."  *Carter*, 822 F.3d at 57.

B.  Analysis

Plaintiff brings causes of action for both negligent and willful violation of the FCRA based on Defendant's conduct as laid out above.  (*See* Am. Compl. ¶¶ 26–46.)  Defendant argues

that this Court does not have subject matter jurisdiction over the instant Action because: (1) Plaintiff failed to allege that the credit report was actually disseminated to a third-party grantor, (*see* Def.'s Mem. 10–12); (2) risk of future harm is insufficient to create standing, (*see id*. at 13); and (3) mental and emotional pain are insufficient on their own to create standing, (*see id.* at 13–14).  Defendant also argues that the Plaintiff cannot establish a violation of the FCRA as a matter of law because: (1) when viewed as a whole, reporting the historical pay status is not inaccurate or misleading, (*see id.* at 14–18); and (2) credit reporting algorithms are "irrelevant" to both the allegations and U.S. Bank's reporting, (*see id*. at 18–20).  The Court will address each argument in turn.

### 1.  Subject Matter Jurisdiction

Given that, absent subject matter jurisdiction over Plaintiff's claims, the Court lacks a legal basis to examine their merits, the Court will consider the question of standing at the outset. *See Can v. United States*, 14 F.3d 160, 162 n.1 (2d Cir. 1994) (explaining that, "in most instances[,] the question of whether a court has subject-matter jurisdiction is, conventionally and properly, the first question a court is called on to consider").

### a.  Applicable Law

Standing asks "whether the litigant is entitled to have the [C]ourt decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id.*; *see also Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015) ("A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing[.]" (quotation marks and citation omitted)); *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d

82, 88 n.6 (2d Cir. 2006) ("Although lack of Article III standing and subject matter jurisdiction are distinct concepts, Article III standing remains, as we have noted, a limitation on the authority of a federal court to exercise jurisdiction." (citation omitted)).  "Constitutional standing refers to the requirements that parties suing in federal court establish that a 'Case' or 'Controversy' exists within the meaning of Article III of the United States Constitution."  *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016).  Constitutional standing requires:

> (1) that the plaintiff ha[s] suffered an "injury in fact"—that is, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) that there is "a causal connection between the injury and the conduct" of which the plaintiff complains; and (3) that it is "likely . . . that the injury will be redressed by a favorable decision."

*Id.* (second alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.

The Supreme Court recently issued a decisive ruling on the issue of constitutional standing in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), which, along with its Second Circuit progeny, *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58 (2d Cir. 2021), makes clear that plaintiffs who allege only a "procedural" or "informational" harm lack standing.

*TransUnion* involved a class of 8,185 plaintiffs who alleged that TransUnion, a credit reporting agency, had violated the FCRA via its use of a system that had inaccurately flagged the plaintiffs' credit files as "potential match[es]" to persons identified as national security risks by the Treasury Department's Office of Foreign Assets Control ("OFAC").  *TransUnion*, 141 S. Ct. at 2200–02.  The Supreme Court ultimately bifurcated the class, finding that 1,853 class members whose inaccurately flagged credit reports had been disseminated to third parties had standing while the other 6,332 class members did not, because "[p]ublication is essential to

liability in a suit for defamation." *Id.* at 2208–09 (quotation marks omitted).  In short, the

Supreme Court held: "No concrete harm, no standing." *Id.* at 2200.

 *Maddox* involved two plaintiffs who alleged that the Bank of New York Mellon ("BNY

Mellon") had failed to file their satisfaction of mortgage within 30 days of the plaintiffs' full

satisfaction of their mortgage loan, as required under New York's satisfaction-of-mortgage

statues. *Maddox*, 19 F.4th at 59–60.  The Second Circuit had initially ruled, in a pre-*TransUnion*

opinion, that the plaintiffs' allegations had established an injury in fact sufficient to confer

constitutional standing, because BNY Mellon's violation of the statutes "exposed [the plaintiffs]

to a material risk of concrete harm, including the risk of not being able to borrow during the

period of delay." *Id.* at 62 (quotation marks, alteration, and citation omitted).  After this opinion,

however, BNY Mellon filed a petition for rehearing and the Supreme Court decided *TransUnion*,

leading the Second Circuit to withdraw its previous opinion and rule that because the mortgagor-

plaintiffs failed to allege that they had actually suffered any actionable reputational harm

(including or in addition to any adverse credit reporting to third parties) or monetary harm during

the lender-defendant's delay in recording the plaintiffs' satisfaction of the mortgage loan, they

lacked standing.  *Id.* at 64–65.

 District courts following *TransUnion* and *Maddox* assessing claims brought pursuant to

both the FCRA and the Fair Debt Collection Practices Act ("FDCPA"), "an analogous statute,"

*Adler v. Penn Credit Corp.*, No. 19-CV-7084, 2022 WL 744031, at *8 (S.D.N.Y. Mar. 11, 2022)

(quoting *Sputz v. Alltran Fin., LP*, No. 21-CV-4663, 2021 WL 5772033, at *6 (S.D.N.Y. Dec. 5,

2021)), have uniformly held that absent specific allegations of reputational or monetary harm,

plaintiffs lack constitutional standing, *see, e.g.*, *Gross v. TransUnion, LLC*, — F. Supp. 3d — ,

2022 WL 2116669, at *3 (E.D.N.Y. June 13, 2022) (holding, in FCRA context, that where the

plaintiff's "alleged harms are not expenses, costs, any specific lost credit opportunity, or specific emotional injuries," the allegations of the complaint "fail[ed] to show how [the defendant's] credit alleged error caused [the] plaintiff to suffer a 'concrete and particularized' harm");

*Zlotnick v. Equifax Info. Servs., LLC*, 583 F. Supp. 3d 387, 391 (E.D.N.Y. 2022) (holding, in FCRA context, that "conclusory allegations" of "mental and emotional pain, anguish, humiliation, and embarrassment of credit denial," without more, cannot confer constitutional standing); *Williams v. Portfolio Recovery Assocs., LLC*, Nos. 21-CV-5656, 21-CV-5662, 21-CV-5968, 21-CV-5970, 2022 WL 256510, at *3 (E.D.N.Y. Jan. 27, 2022) (remanding the plaintiffs' FDCPA claims due to lack of subject matter jurisdiction, finding that by alleging only that the plaintiffs' inaccurate credit data (and related information) was provided by the defendant to a third-party vendor, "no actual tangible harm" was alleged by the plaintiffs); *see also Adler*, 2022 WL 744031, at *7–8 (reviewing cases in which courts have dismissed claims on standing grounds where the plaintiffs failed to allege a concrete harm).

### b.  Application

Both Parties spend significant portions of their memoranda debating whether Plaintiff's allegations are sufficient to demonstrate that he has suffered a concrete harm, disputing the ultimate holdings in *TransUnion*, *Maddox*, and related caselaw.  As relevant to this inquiry, both Parties appear to agree that *TransUnion* held that, "for standing under the FCRA, a plaintiff's credit report must have been actually disseminated to a third-party entity," and "without actual dissemination, there is no concrete harm and thus no standing."  (Def.'s Mem. 10; *see also* Pl.'s Mem. 4–5.)  However, the Parties disagree on the application of this holding, including what type of evidence from a credit report should be taken into account to determine dissemination, (Def.'s Reply 2; Pl.'s Sur-Reply 1–3); whether Plaintiff actually alleged dissemination sufficient for standing, (Def.'s Mem. 11–12; Pl.'s Mem. 6–14); and whether dissemination alone is

sufficient to establish a concrete harm absent other allegations of concrete harms, (Def.'s Reply 3–4).

The Court starts—as it is required to do—with the holdings of the controlling cases at issue.  In *TransUnion*, the Supreme Court explained that "certain harms readily qualify as concrete injuries under Article III," identifying "traditional tangible harms, such as physical harms and monetary harms" as "obvious."  141 S.Ct. at 2204.  However, the Supreme Court also noted that "[v]arious intangible harms can also be concrete," recognizing that "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts . . . includ[ing], for example, reputational harms."  *Id*. (citations omitted); *see also Meese v. Keene*, 481 U.S. 465, 473 (1987) (identifying reputational harms as concrete injuries sufficient for standing).  The Supreme Court agreed with the plaintiffs in *Trans Union* that "[u]nder longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party."  141 S. Ct. at 2208–09 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990) (quotation marks omitted), and then *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)).  From this, the Supreme Court concluded that, because "TransUnion provided third parties" with the relevant credit reports, a subset of the class members "therefore suffered a harm with a close relationship to the harm associated with the tort of defamation."  *Id*. at 2209 (internal quotation marks omitted); *see also id.* ("In short, the 1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III.").  However, the Supreme Court also held that in suits for damages under the FCRA, plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or a risk of future harm," stating with certainty: "No concrete harm, no standing."  *Maddox*, 19 F.4th at 64 (quoting *TransUnion*, 141 S. Ct. at 2214).

In *Maddox*, the Second Circuit acknowledged the impact of *TransUnion* in FCRA cases, stating that "the determinative standing issue is whether the [plaintiffs] suffered a concrete harm due to the [defendant's] violation." *Id.*  In holding that the plaintiffs in that case did not establish standing, *Maddox* reasoned that the plaintiffs "do not allege that they suffered any reputational harm due to the [defendant's] violation," because the misleading record at issue "may have been public and available to all; but, so far as is known, it was read by no one." *Id.* at 65.

Here, the Court finds that Plaintiff's allegations more readily resemble *TransUnion* rather than *Maddox*, and thus Plaintiff has alleged a concrete injury sufficient for standing.  In the Amended Complaint, Plaintiff specifically addresses the dissemination theory discussed in *TransUnion* and *Maddox*, alleging that "the inaccurate information was disseminated to other third parties, persons, entities and credit grantors, as evidenced by inquiries on the Plaintiff's credit report, as well as to credit score entities."  (Am. Compl. ¶ 24.)  As a result, Plaintiff specifically alleges that Plaintiff "suffered concrete harm in the form of loss of credit, loss of ability to purchase and benefit from credit, a chilling effect on applications for future credit," and various mental and emotional injuries due to credit denial.  (*Id.* ¶ 25.)

Reviewing the credit report, upon which the Amended Complaint is based, it is clear that Plaintiff's credit report containing the allegedly incorrect information was "disseminated" as defined by *TransUnion* and *Maddox*.  The credit report identifies 59 "soft inquiries" related to Plaintiff's account, which "are inquiries, for example, from companies making promotional offers of credit, periodic account reviews by an existing creditor or [a person's] own requests to check [his or her] credit file."  (Credit Report 7.)  Of the 59 requests, the report lists 8 inquiries from Equifax, 2 inquiries from CIC/Experian Rpts ("Experian"), 32 inquiries from Credit Karma, Inc. ("Credit Karma"), and 17 inquiries from "Capital One National Assoc" ("Capital

One"). (*Id*. at 7–9.) This Court has previously held that dissemination of credit reports to traditional credit reporting agencies, like Equifax and Experian, are "not the type of third parties contemplated by the Supreme Court in *TransUnion*," stating that the Supreme Court "clearly contemplated potential creditors." *Spira v. Trans Union, LLC*, No. 21-CV-2367, 2022 WL 2819469, at *5 (S.D.N.Y. July 19, 2022); *see also Campbell v. Portfolio Recovery Assocs.*, No. 21-CV-1322, 2022 WL 657225, at *2 (E.D.N.Y. Mar. 4, 2022) ("[T]he distribution of inaccurate information to a credit reporting agency, as opposed to a potential creditor, . . . does not constitute or cause concrete injury for standing purposes."). There is no reason to depart from this logic here, and the Court thus discounts the inquiries from Equifax and Experian in this analysis.

However, the vast majority of the inquiries on Plaintiff's report are from two other entities: Credit Karma and Capital One. As to Credit Karma, it is plausible that the company is viewing Plaintiff's report in its role as a potential third-party creditor. While most well known as a company that "work[s] with Equifax and TransUnion . . . to give [] members access to their scores for free," Credit Karma also serves "free personalized offers and recommendations [to members] on their profile," such as offers "for a credit card or loan." *About Credit Karma*, Credit Karma, https://www.creditkarma.com/about (last visited Oct. 21, 2022). Presumably, to determine which offers it provides its members, Credit Karma relies on the information disseminated within the credit report. The same argument holds for Capital One, which is a bank that offers numerous financial products, such as credit cards, checking and savings accounts, auto loans, and business and commercial banking and loans. *See Capital One*, https://www.capitalone.com/ (last visited Oct. 21, 2022). Plaintiff has alleged exactly the type of dissemination envisioned in *TransUnion*: Defendant's credit reports were sent to third party

creditors with the alleged inaccurate information.  As with *TransUnion*, "[t]here could be no doubt that the third-party businesses viewed those credit reports, which they had specifically requested and paid for."  *Maddox*, 19 F.4th at 65.

Defendant puts forth several arguments in opposition to Plaintiff's standing, but each is unavailing.  First, Defendant relies on two inapposite cases to argue that Plaintiff has not alleged "any facts . . . to support [Plaintiff's] bald conclusions."  (Def.'s Mem. 11.)  Defendant attempts to compare Plaintiff's Amended Complaint to *Zlotnick v. Equifax Info. Servs., LLC*, a case in which the court found that the plaintiff's allegations that the credit report had been disseminated "to various persons and credit guarantors, both known and unknown" was insufficient to show a concrete harm.  583 F. Supp. 3d at 391 ("[N]o actual dissemination is alleged.").  However, Plaintiff *has* alleged "actual dissemination to third-party creditors" in this case by pointing to the inquiries on Plaintiff's credit report.  *Id.* ("Thus, while [the] plaintiff claims that his credit score was lowered as a result of the alleged improper reporting, he fails to allege any particularized injury *or* actual dissemination to third-party creditors." (citation omitted) (emphasis added)).  As Plaintiff points out, this allegation "sets this case apart from other cases in this jurisdiction that have rejected [P]laintiff's allegations as conclusory."  (Pl.'s Mem. 7.)

Defendant also relies on a set of cases that rely on the "mailing-vendor theory, whereby plaintiffs attempted to allege standing in FCRA and FDCPA cases by alleging that the defendants had, for instance, 'conveyed private information to third-party vendors . . . so the vendors could draft and mail collection letters to each [p]laintiff regarding his debt obligations.'" *Spira*, 2022 WL 2819469, at *4 (quotation marks omitted).  Defendant specifically cites *Williams v. Portfolio Recovery Assocs.*, where the court found that the plaintiffs did not allege a tangible harm where the named plaintiff's debt was disclosed to a third-party vendor who used

this information "to populate a form that was sent to, received by, and read by each of the named plaintiffs." 2022 WL 256510, at *2.  (*See also* Def's Mem. 11–12.)  The instant Action does not resemble this line of mailing-vendor cases, as Plaintiff's credit report was disseminated to third-parties, not the type of "intra-company disclosures" of mailing-vendors in those cases.  *In re FDCPA Mailing Vendor Cases*, 551 F. Supp. 3d 57, 62 (E.D.N.Y. 2021).

Next, Defendant repeatedly argues that the Court should take note of the distinction between "hard" and "soft" inquiries on Plaintiff's credit report, stating that only hard inquiries are sufficient to establish dissemination-based concrete injury.  (Def.'s Mem. 12 ("There are no hard inquiries on Plaintiff's Credit Report . . ., [t]hus, the Credit Report itself proves Plaintiff has not been denied credit or suffered any actual concrete consequences as a result of any allegedly inaccurate reporting."); Def.'s Reply 2–4.)[3]  To start, "[a]n inquiry is 'soft' when it is made as a part of an ongoing relationship between the inquirer and the consumer, relates to employment screening, or will otherwise leave the consumer's credit score unaffected.  Conversely, an inquiry is 'hard' when it is associated with a consumer-initiated application for credit and may therefore impact the consumer's credit score."  *Hines v. Equifax Information Servs., LLC*, No. 19-CV-6701, 2022 WL 2841909, at *2 (E.D.N.Y. July 16, 2022) (report and recommendation); (*see also* Credit Report 7 (describing hard inquiries as "inquiries made by companies with whom you have applied for a loan or credit," and soft inquiries as "inquiries, for example, from

---

[3] Defendant alleges, with no support for the proposition, that "the only soft inquiries [on Plaintiff's credit report] are Plaintiff's own requests and periodic account reviews from an existing creditor."  (Def.'s Mem. 12.)  However, as Plaintiff points out, "this is speculation on the part of Defendant which, without further discovery," is unpersuasive.  (Pl.'s Mem. 13.) Drawing all reasonable inferences in favor of the Plaintiff, the Court declines to consider this argument.

companies making promotional offers of credit, periodic account reviews by an existing creditor or your own requests to check your credit file").)

Contrary to Defendant's assertion, the distinction between hard and soft inquiries is not relevant in the wake of *TransUnion* and *Maddox*.  In *TransUnion*, the dividing line within the class for plaintiffs with or without standing was not based on tangible applications for loans or credit.  Instead, the Supreme Court analogized to an independent injury, defamation, based on an allegedly inaccurate report that was sent to third-party creditors.  *TransUnion*, 141 S.Ct. at 2208–09.  Defendant now asks this Court to limit dissemination-based standing to third-party creditors who *solely* initiate a *hard* inquiry pursuant to an application by a person for credit, stating that "if Plaintiff was not actually denied credit, or did not suffer some other actual harm such as a higher interest rate or other unfavorable terms, Plaintiff has no standing."  (Def.'s Reply 3.)  However, to read this requirement into the injury-in-fact inquiry under the FCRA would render the defamation-based injury superfluous.  The injury caused by dissemination, as outlined in *TransUnion*, is not tied to actual credit denial or related harms.  Instead, Plaintiff "is injured when a defamatory statement that would subject him to hatred, contempt or ridicule is *published* to a third party."  *TransUnion*, 141 S.Ct. at 2208 (emphasis added).  Plaintiff's credit report was indeed published to third parties, even if they generated only soft inquiries, which is "essential to liability in a suit" under the FCRA.  *Id*. at 2209 (citation and quotation marks omitted).

For the same reasons, Defendant is incorrect about the application of *Maddox* to this case.  (*See* Def.'s Reply 3 ("Plaintiff's reliance on *Maddox*, is similarly misplaced.").)  As stated on the credit report itself, creditors indeed *can be* "interested in Plaintiff's credit worthiness" based on a soft inquiry.  (*Id*.; *see also* Credit Report 7 (stating that soft inquiries are used by, among other things, "companies making promotional offers of credit").)  Companies like Credit Karma and

Capital One can use soft inquiries to assess a person's credit practices, which dictate which

offers a person qualifies for, how much credit may be extended to them, and more.  Due to this,

and drawing all reasonable inferences in Plaintiff's favor, Plaintiff suffered a defamation-like

concrete injury because Plaintiff's credit report was disseminated to third parties with the alleged

inaccuracy.  As such, Plaintiff has sufficiently put forth allegations to establish standing.[4]

### 2.  Motion for Judgment on the Pleadings

Aside from standing, Defendant argues that Plaintiff's claims fail as a matter of law

because (1) when viewed in its entirety, the credit report at issue is accurate as a matter of law,

(*see* Def.'s Mem. 15–17), (2) reporting "historical pay" status is not inaccurate or misleading,

(*see id.* at 17–18), and (3) credit reporting algorithms are "irrelevant" to both the claims and U.S.

Bank's reporting.  (*see id.* at 18–19).  For the reasons stated below, Plaintiff has failed to state

valid claims as a matter of law under the FCRA, and Defendant's Motion must be granted.

### a.  Applicable Law

"The [FCRA] 'regulates credit reporting procedures to ensure the confidentiality,

accuracy, relevancy, and proper utilization of consumers' information.'"  *Longman v. Wachovia*

---

[4] Defendant is correct that conclusory allegations identifying risk of future harm, mental and emotional pain, and similar allegations are not enough, on their own, to create standing. (Def.'s Mem. 13–14); *see also Zlotnick*, 583 F. Supp. 3d at 391; *Gross*, 2022 WL 2116669, at *3 (explaining that "[t]he only allegations that could support standing in the complaint are that [the] plaintiff suffered an 'injury to his credit worthiness,' 'increased difficulty obtaining credit,' and 'embarrassment, humiliation, and other emotional injuries,'" and that "these conclusory allegations are insufficient" to demonstrate standing); *Wan v. Trans Union LLC*, No. 22-CV-115, 2022 WL 955290, at *1–2 (E.D.N.Y. Mar. 30, 2022) (finding no standing because (1) "[the] [p]laintiff's allegations that she suffered 'limited credit opportunities' and harm to her 'otherwise positive credit' do not constitute concrete injury" absent "an allegation that these circumstances resulted in a materialized injury[] or a sufficiently imminent and substantial risk of injury" and (2) "[the] [p]laintiff's allegations that inaccurate information about her was distributed . . . to one or more third parties similarly does not constitute concrete injury because the complaint does not clearly allege any facts demonstrating disclosure to third parties" (quotation marks omitted)).
  However, because Plaintiff has sufficiently alleged dissemination-based standing, the Court declines to address these arguments in the standing inquiry.

*Bank, N.A.*, 702 F.3d 148, 150 (2d Cir. 2012) (quoting 15 U.S.C. § 1681(b)).  "An entity that reports credit information about consumers to credit reporting agencies is known as a 'furnisher,' and it has certain duties under the FCRA."  *Hart v. Simon's Agency, Inc*., No. 19-CV-342, 2022 WL 4619863, at *4 (N.D.N.Y. Sept. 30, 2022).  When a furnisher receives notice of "a dispute as to the completeness or accuracy of any information provided" to a CRA, it must "conduct an investigation," "report the results of the investigation to the consumer reporting agency," and if the disputed information "is found to be inaccurate or incomplete . . . modify that item of information."  15 U.S.C. § 1681s-2(b).  In addition, a furnisher must complete its investigation within 30 days.  *See* 15 U.S.C. 1681s-2(b)(2).

 "To prevail on a claim under Section 1681s-2(b), a plaintiff must show that '(1) the furnisher received notice of a credit dispute from a credit reporting agency, and (2) the furnisher thereafter acted in willful or negligent noncompliance with the statute.'"  *Pierre v. Wells Fargo Financial National Bank*, No. 21-CV-3141, 2022 WL 4625350, at *2 (S.D.N.Y. Sept. 30, 2022) (quoting *Markovskaya v. Am. Home Mortg. Servicing, Inc.*, 867 F.Supp.2d 340, 343–44 (E.D.N.Y. 2012)).  "Accuracy is also an essential element of a claim for negligent or willful violation of § 1681s-2(b) of the FCRA.  Thus, a threshold showing of inaccuracy or incompleteness is necessary to succeed on a claim under § 1681s-2(b)."  *Artemov v. TransUnion, LLC*, 2020 WL 5211068, at *3 (E.D.N.Y. Sept. 1, 2020) (citations omitted); *see also Holland v. Chase Bank USA, N.A.*, 475 F.Supp. 3d 272, 276 (S.D.N.Y. 2020) ("A prima facie showing of inaccurate reporting is thus essential to maintaining a § 1681s-2(b) claim.") (quotation marks omitted).

 "The overwhelming weight of authority holds that a credit report is inaccurate . . . either when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it

can be expected to have an adverse effect on credit decisions." *Gross v. Private National Mortgage Acceptance Company, LLC*, 512 F. Supp. 3d 423, 426 (E.D.N.Y. 2021) (quoting *Wenning v. On-Site Manager Inc*., No. 14-CV-9693, 2016 WL 3538379, at *9 (S.D.N.Y. June 22, 2016) (quotation marks omitted)).  However, "[m]ere imprecision is not enough . . . .[,] [r]ather, a plaintiff must establish that the information provided by the [consumer reporting agency] is open to an interpretation that is directly contradictory to the true information." *Id*. (quoting *Wenning*, 2016 WL 3538379, at *9).  Moreover, if the information in the credit report is accurate, "no further inquiry into the reasonableness of the consumer reporting agency's procedure is necessary." *Artemov*, 2020 WL 5211068 at *2 (citations omitted).

<u>b.  Application</u>

Here, Plaintiff alleges that U.S. Bank reported certain inaccurate information to Equifax about Plaintiff's account status by "continu[ing] to report the Plaintiff's account status as 'not more than three payments past due'" despite the fact that "the Plaintiff no longer had an obligation to U.S. Bank" and "Plaintiff's account was paid off and closed out with a zero balance." (Am. Compl. ¶¶ 8, 10, 11.)  Plaintiff alleges that "[s]uch reporting is inaccurate on its face as it fails to properly advise as to the actual status of Plaintiff's debt." (*Id*. ¶ 12.)  However, when looking at the entire credit report as a whole, Plaintiff fails to effectively plead that his credit report is "materially misleading" to creditors.  *See Gross*, 512 F. Supp. at 426–27 (reviewing the report as a whole to conduct the requisite analysis).

Plaintiff's credit report lists several other categories of information about the account, including several tables of "account history" identifying, among other things, the account's balance, scheduled payments, actual payments, and amount past due.  (Credit Report 4–5.) These categories of historical account information are instructive, as they all end in December 2019.  For example, the report shows no balance, scheduled payment, or amount past due after

December 2019.  (*Id*.)  However, Plaintiff still alleges that U.S. Bank continues to report information that "explicitly contradicts the account status, preventing the account status from . . . being interpreted as merely a representation of the account's history."  (Am. Compl. ¶ 13.) Specifically, Plaintiff alleges that the payment history indicates that Plaintiff's account "had a 60-day delinquency at the time of the final payment," which Plaintiff alleges "is in direct conflict with the account status" stating that the account is not more than three payments past due.  (*Id*. ¶ 14.)  The Court disagrees.

On its face, stating that an account has a 60-day delinquency is not in conflict with an account status of not more than three payments past due.  Instead, the account status seemingly *includes* the 60-day delinquency, which in other terms, could be described as "two payments past due."  Moreover, the credit report also contains numerous pieces of relevant information, including reporting the balance as $0, (Credit Report 4); providing a payment history showing when the account was past due but noting that it was not past due any time after December 2019, (*id*. at 6); and listing several "account details," such as a zero balance and designating the "activity" of the account as "PAID_AND_CLOSED," (*id*.).  The report finally also leaves the following fields blank, indicating a zero balance: "Amount Past Due," "Actual Payment Amount," and "Scheduled Payment Amount."  (*Id*.)  Thus, the Court finds no contradiction between these terms, and instead finds that U.S. Bank was merely reporting historical pay status, as it is allowed to do.  *See Gross*, 512 F. Supp. 3d at 427 ("Reading these entries together, the only logical inference is that the account was *previously* 30 days past due.  It is simply not plausible to think that a creditor would conclude otherwise." (emphasis in original)); *Holland*, 574 F. Supp. 3d at 299–300 (finding that an account was not misleading when a plaintiff was delinquent, made a last payment bringing the account balance to zero, and the account was

closed); *Ostrander v. Trans Union LLC*, No. 20-CV-5227, 2021 WL 3271168, at *8 (E.D. Pa. July 30, 2021) (collecting cases).

Plaintiff cites numerous cases from courts in the Second Circuit and around the country in opposition, but these cases are inapplicable. First, Plaintiff cites to a line of cases in the Third Circuit "addressing accounts that were closed when the account holder paid off the account in full, simultaneously closing the account." *Walker v. Trans Union LLC*, No. 20-CV-5235, 2021 WL 5866876, at *8 (E.D. Pa. Dec. 10, 2021). Plaintiff relies primarily on *Smith v. Trans Union, LLC*, No. 20-CV-4903, 2021 WL 1061213 (E.D. Pa. Mar. 19, 2021), which held that a "historical remark" as alleged by the defendants in the case could be interpreted to be a "current status" based on the plain language in the report. *Id*. at *3. Plaintiff also compares the credit report in *Smith*, which said "Pay Status: 60 Days Past Due" with the "PAID_AND_CLOSED" activity designator on Plaintiff's credit report to argue that this Court should adopt the same result. (Pl.'s Mem. 19–20; *see also* Credit Report 6.) In addition to *Smith*, Plaintiff relies on *Barrow v. Trans Union, LLC*, No. 20-CV-3628, 2021 WL 1424681 (E.D. Pa. April 13, 2021), which comes to a similar result.

However, as Defendant points out, *Smith* and *Barrow* are not controlling and, in fact, have been met with disagreement in their own circuit. *See Ostrander*, 2021 WL 3271168, at *9 (declining to follow *Smith* because a remark that stated "Maximum Delinquency of 60 days in 12/2013" when reviewed with the rest of the credit report made it "impossible for a potential creditor to believe that the plaintiff's account is currently past due"); *Gibbs v. Trans Union LLC*, No. 21-CV-667, 2021 WL 4439546, *3 (E.D. Pa. Sept. 28, 2021) ("To the extent that the credit reports at issue in *Smith* and *Barrow* did not include that historic reference, they are not on all fours with this case."); *Holland*, 574 F. Supp. 3d at 303 ("Here, the [c]ourt finds the reasoning

and conclusion of the *Ostrander* and *Gibbs* courts to be more persuasive.  No reasonable person, creditor or user, viewing [the plaintiff's] reports in their entirety, would think that the [] loan was still actively 'past due.'"); *Jackson v. Trans Union, LLC*, No. 21-CV-23, 2021 WL 5824200, at *5–6 (E.D. Pa. Dec. 7, 2021) (declining to follow *Smith* because the factual differences described in *Smith* were "a distinction without a difference" that "[did] not change the outcome of the legal analysis[,] [which] considers [a plaintiff's] credit report as a whole," and calling the plaintiff's "reliance" on *Smith and Barrow* "entirely unsuccessful").

Moreover, Defendant persuasively argues that "pay status" listed in the credit report in *Smith* is the critical barometer rather than information about historical past due amounts.  (*See* Def.'s Mem. 17–18.)  This distinction is important because the Court finds that these two statements are not alike for several reasons.  In *Smith*, the status indicated a specific amount of time that the account was overdue, i.e. 60 days, rather than the vaguer description of "not more than three payments" at issue here, indicating that the account at some point stopped being past due.  *C.f. Ortner v. Equifax Info. Servs.*, No. 21-CV-2219, 2022 WL 3566623, at *4 (D. N.J. Aug. 18, 2022) (reporting a payment history of "over 120 days past due").  And as discussed in another case in the Eastern District of Pennsylvania, Plaintiff's credit report notes that the delinquency on the U.S. Bank account occurred on October 1, 2019.  (Credit Report 6); *see also Gibbs*, 2021 WL 4439546 at *3 (noting the dates of delinquency and stating that "[t]o the extent that the credit reports at issue in *Smith* and *Barrow* did not include that historic reference, they are not on all fours with this case."); *Ostrander*, 2021 WL 3271168, at *9 ("When read together with the other trade lines of the credit report, it would be impossible for a potential creditor to believe that the plaintiff's account is currently past due.").

Plaintiff's citations to several other cases are also unavailing.  For example, both *Mund v. Transunion,* No. 18-CV-6761, 2019 WL 955033 (E.D.N.Y. Feb. 27, 2019) and *Friedman v. CitiMortgage, Inc.*, No. 18-CV-11173, 2019 WL 4194350 (S.D.N.Y. Sept. 3, 2019) involve credit reports that indicated that the plaintiffs still had a monthly payment on the account, "raising the plausible [inference] that a creditor could read the [status] as a current one."  *Gross*, 512 F. Supp. at 427.  "Here, in contrast, [P]laintiff's credit report does not show a monthly payment, and all other relevant inquiries suggest that the ["Account Status"] entry refers to a previous pay status.  Therefore, there is much less of a chance that a creditor could be misled."  *Id*.  Similarly, Plaintiff's reference to *Huggins v. FedLoan Servicing*, No. 19-CV-21731, 2020 U.S. Dist. LEXIS 229290 (D. N.J. Dec 2, 2020) is not persuasive.  The court in *Huggins* denied Defendant's motion for judgment on the pleadings, finding "[t]he Court cannot say here, at the pleading stage and without the disputed tradeline in the record, that a tradeline indicating that a consumer is 120 days late, after the customer had transferred the debt is not misleading as a matter of law."  *Id*. at *16.  However, this Court has access to Plaintiff's credit report and "need[s] no further information to determine whether the tradelines are accurate."  *Bibbs*, 521 F. Supp. 3d at 580.

Finally, Plaintiff alleges that "the inaccurate account status is of significance even without consideration of the rest of the report," because this field is "specifically designed to be understood as the current status of the account[, and, as] such, credit scoring algorithms take this data field into account when generating a credit score" causing these unnamed companies to generate a lower credit score.  (Am. Compl. ¶ 17.)  However, "[t]he question the Court must answer is whether the credit report is misleading, not whether some third party could read the credit report incorrectly.  Indeed, there is no way for the Court to control the way people read a

credit report, nor is there a way for the Court to know what quirk of computer programming leads a particular algorithm to draw particular conclusions from aspects of [a] computer report." *Gibbs v. Trans Union LLC*, No. 21-CV-667, 2021 WL 5882109, at *2 (E.D. Pa. Dec. 13, 2021); *see also Walker v. Trans Union LLC*, Nos. 20-CV-5179, 20-CV-5235, 21-CV-23, 21-CV-152, 2022 WL 309434, at *2 (E.D. Pa. Feb. 2, 2022) ("[T]he plaintiffs' additional allegation fails out of the gate because their argument is that some unspecified algorithms used by 'the lending industry' will misread information that the Court has already determined is not inaccurate as a matter of law."); *O'Neal v. Equifax Information Servs., LLC*, No. 21-CV-80968, 2021 WL 4989943 (S.D. Fla. Oct. 27, 2021) ("How third-party companies choose to utilize algorithms to decipher the accurate information reported by Defendant has no bearing on the accuracy of the report itself.").  Moreover, this Court has found that the credit report is not misleading to a reasonable third party, which Plaintiff must necessarily argue includes these amorphous computer algorithms.  Thus, this argument also fails.

Of course, "[t]here is certainly room for debate that the information on [Plaintiff's] account[] could be more accurate."  *Holland*, 574 F. Supp. 3d at 300 (emphasis omitted).  As explained in *Holland*:

> [A]s a matter of law, the Court's task is to consider whether the information is inaccurate or misleading, not to look for ways that the information might be more accurate.  In other words, the Court's focus is to discern differences of kind, not degree.  Therefore, as tempting as it can be, the Court will not engage in speculative semantic schooling of credit agencies or furnishers of credit information. . . .
>
> [A] s a matter of policy, if the Court were to grant [the plaintiff's] request, there would be no limiting principle.  If information in a credit report that could be more accurate is inaccurate for purposes of the FCRA, then every single consumer in the United States would be able to state a claim under the FCRA.  For example, [the plaintiff] believes his accounts would be accurate if they had a notation that they were "Paid in Full."  But would it not also be more accurate to state that they were "Only Late in the Last Pay Period"?  Or "Only Late for X Days Until Final Payment"?  If a plaintiff could make a claim under the FCRA that credit

information was inaccurate simply by alleging, entirely subjectively, that there is a "better" (perhaps only longer, more cumbersome) way to report it, federal courts would take up the unwelcome task of engaging in pedantic pedagogy of phraseology.  The outcome of such effort could well be forms and reports that merely have more words to dispute.

*Holland*, 574 F. Supp. 3d at 300–01.

On this, the Court agrees.  As such, "[f]rom the perspective of a reasonable person, user or creditor, viewing [Plaintiff's] report[] in [its] entirety and considering all of the various fields, there is one reasonable reading:"  Plaintiff was delinquent on his U.S. Bank auto loan in October 2019, he made his last payment in December 1, 2019, and from that point on, there was a zero balance on the account.  *Id*. at 299–300.  The account was then closed on March 1, 2020, designated as "paid and closed," and remained closed.  The account did not list any amount past due after December 2019, any balance after December 2019, or any other indicator after that final payment that the account had an outstanding payment.  Given this, U.S. Bank did not "inaccurately" or "misleadingly" report Plaintiff's account status by reporting historical account information, and Defendant's Motion is granted.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion is granted. Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice.  To the extent Plaintiff has a good faith basis for filing an amended complaint, he must do so within 30 days of the date of this Opinion & Order.  If Plaintiff fails to abide by the 30-day deadline, this Action may be dismissed with prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 34).

SO ORDERED.

Dated:   February 14, 2023
        White Plains, New York

                                                    KENNETH M. KARAS
                                        United States District Judge